UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

In re:

Marin D. Frantz and Cynthia M. Frantz,

               Debtors.

Bk. Case No. 11-21337-TLM

IDAHO INDEPENDENT BANK, an Idaho corporation,

               Appellant,

    v.

MARTIN D. FRANTZ, an individual and CYNTHIA M. FRANTZ, an individual,

               Appellees.

Case No. 2:15-CV-00460-EJL

**MEMORANDUM DECISION AND ORDER**

Pending before the Court is the above-entitled matter is Appellants Martin and Cynthia Frantz's appeal from the September 14, 2015 decision (Dkts. 1-1; 5-4, ER 461-501) of the United States Bankruptcy Court for the District of Idaho awarding partial sanctions to Appellee Idaho Independent Bank.  Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interests of avoiding further delay, and because the Court conclusively finds the decisional process would not be aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

1

## BACKGROUND

Appellants Martin and Cynthia Frantz ("Appellants") appeal United States Bankruptcy Judge Terry L. Myers' decision awarding sanctions against them and their attorney based upon improper litigation tactics in an adversary proceeding commenced against Appellants by Appellee Idaho Independent Bank ("IIB").  Specifically, the decision assessed $49,477.46 against Appellants and their attorney, Jonathon Frantz, jointly and severally, for filing motions to disqualify IIB's counsel and expert witnesses ("DQ Motions") shortly before trial.  The Bankruptcy Court determined the DQ Motions were meritless and were filed in bad faith to delay trial, to increase litigation costs, and to concomitantly increase the potential of settlement.  (Dkt. 5-4, ER 494.)[1]

Appellants filed a bankruptcy case in October 2011 (U.S. Bankruptcy Court, District of Idaho, BK-11-21337-TLM) ("Bankruptcy Case").  The Bankruptcy Case stayed state court proceedings in which IIB was pursuing a collection action against Appellants.  On August 23, 2013, IIB commenced an adversary proceeding against Appellants to except Appellants' debts to IIB from discharge due to purported conversion and fraud.  (U.S. Bankruptcy Court, District of Idaho, ADV-13-07024-TLM) ("Adversary Proceeding").  Although they originally obtained experienced bankruptcy counsel, Appellants ultimately selected their son, Jonathon Frantz ("Attorney Frantz") to represent them as co-counsel in both the Bankruptcy Case and the Adversary Proceeding.

---

[1] Unless otherwise referenced, docket citations are to the record in this appeal, 2:15-CV-00460-EJL.

In an effort to control costs, Attorney Frantz eventually became Appellants' lead attorney in the Adversary Proceeding.  (Dkt. 5, ER 36.)

With the participation of all counsel at a December 2013 pretrial conference, Judge Myers set trial in the Adversary Proceeding to commence a year later, on December 1, 2014.  (Dkt. 5-4, ER 466.)  This trial setting was "longer than the norm in this district," but was ordered due to the complicated nature of the case.  (Dkt. 5, ER 58-59.)  The pretrial scheduling order was modified in February, June and August of 2014 to adjust certain discovery and disclosure deadlines, but the December 1, 2014 trial date was not changed.  (Dkt. 5-4, ER 466.)

On October 3, 2014, Appellants sought to continue the trial to allow more time for the disclosure of expert witnesses.  IIB opposed the motion.  Although Appellants and IIB vehemently disagree about the purpose of the Motion to Continue and the underlying details regarding both parties' expert witness disclosure obligations, such dispute is not relevant to the instant appeal.[2]  However, the Motion to Continue also contained vague allegations regarding the potential disqualification of IIB's counsel, Hawley, Troxell, Ennis & Hawley, LLP ("HT").

In the Motion to Continue, Appellants alleged "Mr. Frantz has recently discovered that he, through his former attorneys, hired a partner at [HT] to act as an expert witness in 2009 regarding issues surrounding…[an] asset listed on the Frantzes financial statements,

---

[2] The Bankruptcy Court denied the portion of IIB's sanctions motion seeking fees related to the Motion to Continue, and IIB has not appealed this denial.

which statements are a primary subject of this litigation." (Dkt. 5, ER 37.) Specifically, Mr. Frantz hired HT partner Merlyn Clark as an expert witness on the subject of professional malpractice in a 2009 state court lawsuit Mr. Frantz brought against his former attorneys, Witherspoon Kelley.

Idaho Rule of Professional Conduct 1.9 instructs that a lawyer who has formerly represented a client in a matter shall not, thereafter, represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of a former client, unless the former client gives informed consent confirmed in writing. Appellants and IIB disputed whether Mr. Frantz hired Mr. Clark solely as a testifying expert on the subject of professional malpractice, or, as Appellants contended, as a consulting attorney expert on the issue of damages in the prior litigation.[3] If Mr. Clark was hired solely as a testifying expert, as IIB contended, then no attorney-client relationship between HT and Mr. Frantz was formed and HT's representation of IIB was not improper. Appellants responded that Mr. Clark, even if initially hired as an expert witness, became a consulting attorney expert when he reviewed confidential information and provided opinions on damages in the state court litigation. In their Motion to Continue, Appellants argued they needed additional time "to discover what confidential

---

[3] Attorney Frantz suggested the nexus between the state court malpractice case where Mr. Clark provided expert services and the bankruptcy dischargeability case was "trying to prove whether or not Mr. Frantz committed fraud in establishing values for his assets." (Dkt. 5-2, ER 234-35.)

information HT possesses that relates to those substantial elements of IIB's claims and what course of conduct is appropriate to resolve such breach." (*Id*., ER 38.)

At a hearing on October 20, 2014, the Motion to Continue was denied. During the hearing, Judge Myers noted that HT had already responded to the issue discussing Mr. Clark's role as a prior expert for Mr. Frantz in its opposition to the Motion to Continue, and had cited legal authority explaining why such representation did not constitute an attorney-client relationship or a basis for disqualification of HT in the Adversary Proceeding. (*Id*., ER 71-72.) Judge Myers questioned Attorney Frantz about why the disqualification issue couldn't be dealt with during the October 20, 2014 hearing. (*Id*., ER 72-73.) Attorney Frantz responded that he needed more time to investigate what confidential information had been provided to Mr. Clark during the prior litigation. (*Id*., ER 72-75.) After denying the Motion to Continue, Judge Myers stated, "if there is going to be an issue regarding Mr. Merlyn Clark and the—their allegation at present of conflict, then that will be filed before the end of this month and it will be set for hearing." (*Id*., ER 88.) Appellants filed the first of three disqualification motions on October 31, 2014.

In the first disqualification motion, Appellants claimed the following ethical violations: (1) in 2009, HT, through Mr. Clark, had an alleged attorney-client relationship with Mr. Frantz; (2) IIB was using confidential information obtained by Mr. Clark (and thus, by HT) in the pursuit of its fraud claims against Appellants; and (3) IIB had engaged an expert, Rand Wichman, ("Mr. Wichman") who had also worked for Mr. Frantz as a consultant in the past, and who was also impermissibly using confidential information obtained through his prior relationship with Mr. Frantz in his expert report

5

for IIB.  (Dkt. 5-1, ER 94-113.)  On November 6 and 7, 2014, Appellants also filed two

motions to disqualify IIB's expert witnesses.  The November 6, 2014 disqualification

motion sought to disqualify Wichman, claiming the improper use of confidential

information.  (*Id*., ER 167-72.)  The November 7, 2014 disqualification motion sought to

disqualify IIB's resolve experts, claiming they were retained experts that were not

properly disclosed.  (*Id*., ER 196-201.)  The October 31, November 6 and November 7

Motions to Disqualify shall be referred to collectively hereinafter as "DQ Motions."

On November 17, 2014, the DQ Motions were argued before Judge Myers.

During the hearing, Appellants repeatedly contended an evidentiary hearing was

necessary in order to prove Mr. Frantz provided Mr. Clark with confidential information

relevant to IIB's claims against him, and that HT should thus be disqualified from

representing IIB.  (Dkt. 5-3, ER 232-260.)  After considering the briefing and oral

argument regarding the DQ Motions, Judge Myers determined "the showing by

defendants in their submissions was less than compelling or even preponderating and

[was] not then adequate to justify granting the motions."  (Dkt. 5-4, ER 507.)  However,

because denying the DQ Motions "on a burden of proof type basis and on a then

inadequate showing would leave a cloud hanging over the entire case and hanging over

[IIB's] law firm," and due to the serious nature of the ethical violations alleged, Judge

Myers "reluctantly" vacated the December 1, 2014 trial setting and scheduled the DQ

Motions for an evidentiary hearing.  (*Id*., p. 508.)

After a two-day evidentiary hearing in which seven witnesses testified, the

Bankruptcy Court entered an oral ruling on December 10, 2014 denying each of the DQ

Motions. (*Id.*, ER 503-23.) Judge Myers held the facts and law presented during the hearing established Mr. Clark and Mr. Frantz had not had an attorney-client relationship. (*Id.*, p. 514.) In so holding, Judge Myers found Mr. Clark's "clear and direct" testimony proved that his role in the malpractice litigation was solely that of a testifying expert witness. (*Id.*, ER 511.) Moreover, Mr. Clark testified credibly that he did not review any of Mr. Frantz's confidential information through his role as an expert witness, and that he had also warned Mr. Frantz's former attorneys that any information he received would be subject to discovery in the state court litigation and should not be provided to him. (*Id.*)

During the evidentiary hearing, Regina McCrea, one of Mr. Frantz's attorneys in the state court litigation, also testified. She stated that Mr. Clark was hired as an expert to establish and later testify to the standard of care in attorney representation. (*Id.*, ER 512.) Judge Myers determined Ms. McCrea's testimony was not inconsistent with that of Mr. Clark, and that such testimony showed Mr. Clark had not been a consulting expert in the malpractice litigation, and that he had not entered into an attorney-client relationship with Mr. Frantz. (*Id.*, ER 512-513.) Finally, Mr. Frantz also testified during the evidentiary hearing, but could not offer any firsthand knowledge of the facts and did not provide any probative testimony as to what type of information Mr. Clark had received. (*Id.*, ER 513-14.) Judge Myers accordingly concluded IIB's analysis of the facts and law was supported by the record and that Mr. Clark acted solely as a testifying expert witness. As such, an attorney-client relationship was not created and there was no basis to disqualify HT under IRPC 1.9. (*Id.*, ER 514.)

Judge Myers also denied the Frantz's request to disqualify IIB's expert witnesses. With respect to disqualification of the resolve experts, Judge Myers reviewed the written submissions and ruled from the bench that the motion to disqualify the resolve experts was denied.  (Dkt. 7-1, EER 18, 20.)  With respect to Mr. Wichman's prior role as an expert for Mr. Frantz, Judge Myers determined Appellants "failed to establish that the scope and extent of Wichman's involvement went into the specific areas that he now evaluates as [IIB's] expert."  (Dkt. 5-4, ER 515.)  After considering the standard for disqualifying hired experts, Judge Myers determined Appellants failed to meet their burden to establish both that they had a confidential relationship with Mr. Wichman, and that they had disclosed confidential information to Mr. Wichman that was relevant to the current litigation.  (*Id*., ER 516-519.)

Moreover, Judge Myers also noted Mr. Wichman contacted Mr. Frantz in 2011 to inform him that IIB had retained him to review the status of the relevant development project and that "Mr. Frantz expressed not only his consent, but his opinion that it would be a good thing for him to have Mr. Wichman educate [IIB] and prove an accurate picture of the development."  (*Id*., ER 520.)  Judge Myers noted this consent raised a couple of concerns, one being the delay from 2011 until the November, 2014 disqualification motion claiming concerns over confidentiality or a side switching experts.  (*Id*.)  The other issue concerned, as Judge Myers explained:

> the nature of the information that Mr. Wichman could provide regarding the development.  Mr. Frantz testified that he limited his approval of Wichman's involvement only to discussion of lot line adjustments.  But I find Mr. Wichman's testimony of the discussions more credible.  Frankly, if Mr. Frantz wanted to have his cake and eat it too, by allowing Wichman to educate IIB on the development

8

but simultaneously restrict him from mentioning or commenting on other aspects of the development, a fine line to be sure, then Mr. Frantz was required to make that demarcation clear and unambiguous.  He did not do so and if it was a concern it is one that certainly ripened years ago.

(*Id*.)

Judge Myers ultimately held, "[b]ased on the evidence presented I conclude there's no basis to disqualify Mr. Wichman as [IIB's] expert…  And because Wichman is not disqualified, the attendant motion to disqualify [HT], based on the retention of Wichman, would also be and will also be denied."  (*Id*., ER 521.)  Finally, in denying each of the DQ Motions on November 17, 2014, Judge Myers noted such motions, "could well be viewed as strategic rather than meritorious and designed solely to gain the relief that the failed motion to continue the trial didn't achieve."  (*Id*., p. 506.)

Due to the Court's calendar, trial could not be reset until the end of May 2015.  On May 1, 2015, Appellants signed a Waiver of Discharge ("Waiver") as to all of their creditors, including IIB.  On May 20, 2015, the Court approved the Waiver as to all creditors, and, as a result, vacated the trial in the Adversary Proceeding, as all of IIB's fraud claims were moot since no debts would be discharged.  (Dkt. 5-4, ER 469.)

On June 2, 2015, IIB filed its Motion for Sanctions requesting sanctions against Appellants and Attorney Frantz in the amount of $102,040.27 ("Sanctions Motion"). (*Id*., ER 305.)  IIB sought sanctions for a number of actions taken by Appellants and Attorney Frantz in the Adversary Proceeding, including filing the Motion to Continue on the eve of the discovery deadline and shortly before trial, filing the Disqualification Motion  in bad faith after the Motion to Continue was denied, and filing the expert

witness disqualification motions in bad faith.  (*Id.*, ER 305-324.)  In its sanctions motion, IIB also noted Appellants had recently filed a lawsuit in state court alleging malpractice against HT based on the same facts and claims the Bankruptcy Court rejected when denying the DQ Motions.  (Dkt. 5-3, ER 314, n. 2.)

On June 12, 2015, IIB filed a Supplement to the Motion for Sanctions, submitting an e-mail Mr. Frantz sent to IIB on June 4, 2015 ("June e-mail").  (Dkt. 5-4, ER 541.)  In the June e-mail, Mr. Frantz suggested the recently-filed malpractice case against HT "presented an opportunity not only for [Mr. Frantz] but for IIB and [HT] as well."  (*Id.*)  Specifically, Mr. Frantz invited IIB to join the malpractice case against HT "to lead to a quicker and more lucrative settlement for IIB and [Mr. Frantz]."  (*Id.*)  Although the Bankruptcy Court had already rejected each of HT's purported ethical violations, Mr. Frantz suggested the malpractice lawsuit would allow HT to pay IIB out of its malpractice insurance, and that Mr. Frantz and IIB could structure a deal paying the first $4 million of the insurance funds to IIB in exchange for transferring the relevant development property to Mr. Frantz, with the remaining insurance proceeds split 50/50 between IIB and Mr. Frantz.  (*Id.*)

In addition to proposing the malpractice lawsuit could be used to leverage HT into a settlement, Mr. Frantz significantly noted: "the disqualification case was different than a malpractice case.  We pursued the disqualification case as a probe so that [Appellants' malpractice attorney, Mr. Katz] could wrap his head around the issues and really understand what happened and to see how HT would defend themselves."  (*Id.*, ER 542.)

Notably, Attorney Frantz filed the DQ Motions before the Bankruptcy Court and the state

court malpractice case against HT following Judge Myers' denial of the DQ Motions.

The Bankruptcy Court held a hearing on the sanctions motion on June 15, 2015.

(Dkt. 5-3, ER 378-414.)  During his argument, Attorney Frantz addressed the June e-

mail, stating "[w]e went and found a nationally experienced attorney who does

[malpractice cases] all over the country…you see from the e-mail that Mr. Katz thinks

it's a great case, he's willing to take it on a contingency.  I think that speaks volumes for

what his opinion is about the case.  And it spoke volumes to me as well, you know, as

we're talking to him."  (*Id*., ER 399.)

On September 14, 2015, the Bankruptcy Court entered an extensive oral ruling

granting in part IIB's Motion for Sanctions and awarding IIB $49,477.46 in fees and

nontaxable costs associated with defending the DQ Motions.  (Dkt. 5-4, ER 495.)  After

thoughtful explanation, the Bankruptcy Court denied each of the other basis for sanctions

requested by IIB.  (*Id*., ER 482-501.)  However, Judge Myers was careful to note that the

award of sanctions for the DQ Motions was grounded on the "entirety of the record," and

Appellants' conduct throughout the proceeding.  (Dkt. 5-4, ER 495.)  Judge Myers noted,

"[t]his Court has earlier and repeatedly expressed concern that the motions, objections

and arguments advanced by debtors and their counsel could well be viewed as strategic

rather than meritorious and spoke to strategic desires rather than principled ones."  (*Id*.,

ER 493.)

In awarding sanctions against Appellants and Attorney Frantz for filing the DQ

Motions, Judge Myers noted sanctions are appropriate to deter and provide compensation

for a broad range of litigation tactics, including delaying or disrupting litigation and

acting in the litigation for an improper purpose or for oppressive reasons.  (*Id.*, ER 493.)

Judge Myers determined the DQ Motions were without merit and were filed in order to

increase IIB's litigation expenses, disrupt the litigation, and increase the likelihood of

settlement.  (*Id.*, ER 493-495.)

Judge Myers also addressed the malpractice suit Appellants filed against HT after

denial of the DQ Motions, as well as the June e-mail Mr. Frantz sent IIB.  With respect to

the latter, the Court noted "[t]his rather breathtaking overture followed the two day

hearing [on the DQ Motions] and the December 2014 ruling of this Court that there was

no merit on the evidence to the conflict of interest allegations against [HT]."  (*Id.*, ER

490.)  Further, the Court explained:

> Given their very nature and timing, the disqualification motions before this Court
> were guaranteed to cause IIB and its counsel to spend significant resources.  This
> Court found the motions lacked any merit.  It also now appears that another
> strategy was in play, the use of the motion to disqualify counsel was a test of the
> law firm in order to evaluate an anticipated collateral malpractice suit and . . .
> when the malpractice suit was actually brought, the debtors and their counsel
> disclosed to the state court the existence of the bankruptcy disqualification motion
> but not its unsuccessful outcome. . . .  The salient point here is that all this conduct
> points to the improper use, indeed the misuse of litigation tactics to cause
> economic injury to an opponent and its counsel in the form of increased litigation
> costs.  That manifested intent was to increase the burden of litigation and
> concomitantly increase the potential of settlement.

(*Id.*, ER 494-95.)

In addition to sanctioning Appellants, the Bankruptcy Court determined sanctions

were appropriate against Attorney Frantz due to his conduct during the Adversary

Proceeding.  Specifically, the Disqualification Motion was filed by Attorney Frantz and

the two-day hearing on the disqualification of IIB's counsel, "the matter which supports the award of sanctions[,] was conducted by Attorney Frantz. (*Id.*, ER 500.)

Appellants and Attorney Frantz filed the instant appeal of the sanctions order on September 29, 2015. This Court has jurisdiction over the appeal under 28 U.S.C. § 158(a)(c).

## STANDARD OF REVIEW

When reviewing a bankruptcy court's decision, a district court functions as an appellate court and applies the standard of review generally applied in federal court appeals. *In re Crystal Properties, Ltd.*, 268 F.3d 743, 755 (9th Cir. 2001). Sanctions awards are reviewed for abuse of discretion. *In re DeVille*, 361 F.3d 539, 547 (9th Cir. 2004); *see also Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1242 (9th Cir. 2015) (a district court's "award of sanctions and the amount of the award are reviewed for abuse of discretion."). A court abuses its discretion when it "rests its conclusions on clearly erroneous factual findings or on incorrect legal standards." *Quackenbush v. Allstate Ins. Co.*, 121 F.3d 1372, 1377 (9th Cir. 1997). A bankruptcy court has "broad fact-finding powers" with respect to sanctions and its findings "warrant great deference." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (citing *Townshend v. Holman Consulting Corp.*, 929 F.2d 1358, 1366 (9th Cir. 1990)). This Court may affirm the Bankruptcy Court "on any ground supported by the record." *Shanks v. Dressel*, 540 F.3d 1082, 1086 (9th Cir. 2008).

On appeal, Appellants also argue the Bankruptcy Court's sanctions award deprived them and Attorney Frantz of due process by relying upon actions which were

13

not properly noticed.  (Dkt. 4, p. 23.)  Whether procedures used by a court violated an

individual's right to due process is a mixed question of law and fact subject to *de novo*

review.  *In re Wilborn*, 205 B.R. 202, 206 (9th Cir. BAP 1996).

## ANALYSIS

The Bankruptcy Court awarded sanctions pursuant to its inherent authority under

Section 105(a) of the bankruptcy code.  (Dkt. 5-4, ER 484-487.)  Section 105(a) provides

that a bankruptcy court:

> [M]ay issue any order, process or judgment that is necessary or appropriate to
> carry out the provisions of this title.  No provision of this title providing for the
> raising of an issue by a party in interest shall be construed to preclude the court
> from, sua sponte, taking an action or making any determination necessary or
> appropriate to enforce or implement court orders or rules, or to prevent an abuse of
> process.

11 U.S.C. § 105(a).

Under § 105(a), a bankruptcy court has the inherent authority to sanction parties

and their attorneys for their conduct in bankruptcy proceedings.  *In re Rainbow*

*Magazine, Inc.*, 77 F.3d 278, 284 (9th Cir. 1996).  "The inherent sanction authority

allows a bankruptcy court to deter and provide compensation for a broad range of

improper litigation tactics."  *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 2009) (internal

quotation marks and citation omitted).  Sanctionable conduct includes improper litigation

tactics (such as delaying or disrupting litigation), vexatious conduct, bad faith, wanton

conduct, willful abuses of the judicial process, and acting in the litigation for an improper

purpose or acting for oppressive reasons.  *In re McGuire*, 2014 WL 4418549 at *4 (D.

Idaho 2014) (citations omitted).

14

The Court's inherent powers under § 105(a) "must be exercised with restraint and discretion." *In re Lehtinen*, 564 F.3d at 1059 (citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991)). "Before imposing sanctions under its inherent sanctioning authority, a court must make an explicit finding of bad faith or willful misconduct. . . . With regard to the inherent sanction authority, bad faith or willful misconduct consists of something more egregious than mere negligence or recklessness." *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2010) (internal citations omitted). A finding of bad faith is warranted where an attorney "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *In re Keegan Management Co., Sec. Litig*., 78 F.3d 431, 436 (9th Cir. 1996). A party also demonstrates bad faith by "'delaying or disrupting the litigation or hampering enforcement of a court order.'" *Primus Auto.,* 115 F.3d at 649 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n. 14 (1978).

   1.   *Bad Faith*

Appellants first challenge the Bankruptcy Court's use of its inherent authority to sanction them, arguing neither they nor Attorney Frantz knowingly or recklessly raised a frivolous argument. (Dkt. 4, pp. 9-13.) Appellants argue sanctions may only be based on a filing that is found to be both reckless and frivolous, and that one without the other is insufficient. (*Id*., p. 9.) Appellants suggest "the bankruptcy court never found that the Frantzes or their attorney ever recklessly raised any arguments." (*Id*., p. 10.) Appellants then discuss the "due care" they employed prior to filing the DQ Motions, and contend because they did not recklessly raise "any argument[,] the bankruptcy court could not have imposed its sanctions upon the Frantzes and Attorney Frantz, even if  the

disqualification motions were frivolous." (*Id.*, pp. 11-12.) Appellants also argue that, though the Bankruptcy Court found their DQ Motions were "without merit," it did so only after a two-day hearing and never deemed the motions frivolous. (*Id.*, p. 12.)

Appellants' argument ignores the Bankruptcy Court's decision, wherein Judge Myers made an explicit finding of bad faith and willful misconduct only after recognizing "bad faith or willful misconduct consist of something *more egregious* than mere negligence or recklessness." (Dkt. 5-4, ER 485) (emphasis added). Appellants' claim that the Bankruptcy Court never determined the DQ Motions were reckless is untenable in light of the Court's specific finding that the DQ Motions were filed in bad faith—a higher standard than that required for mere recklessness.

Further, Judge Myers correctly held sanctions are appropriate for bath faith litigation tactics such as "delaying or disrupting litigation and acting in the litigation for an improper purpose of for oppressive reasons." (*Id.*, p. 493). Appellants dispute the Bankruptcy Court's finding that the timing of the motions indicated an intent to delay and disrupt trial. (Dkt. 4, p. 1.) However, the record supports Judge Myers' conclusions with respect to Appellants' egregious delay in filing the DQ Motions. For instance, Appellants waited until October 31, 2014—just one month short of the original December 1, 2014 trial date—to file the initial disqualification motion. In this appeal, Appellants justify their late filing in part by arguing that it was not until "late September 2014" that Mr. Frantz realized he had a former relationship with Mr. Clark. (Dkt. 4, p. 5.) However, Appellants repeatedly identified the date of such discovery as early August 2014 during the Adversary Proceeding. (*See, e.g.*, Dkt. 5-1, ER 105, stating "On August

16

7, 2014, Marty discovered the $10,664 bill be paid directly to HT for Mr. Clark's services.  It was at that time that Marty realized that Mr. Clark was an attorney for HT."); (Dkt. 5-3, ER 354) (claiming "the Frantzes were unaware of any connection between them and [HT] until at the earliest August.")

HT represented IIB throughout the Adversary Proceeding, which commenced in 2011.  It seems until that Mr. Frantz would not realize he had formally hired HT until more than three years into the Adversary Proceeding, within months of the trial date.  Yet, even if Mr. Frantz did not make this discovery until August 7, 2014, Appellants waited nearly three months after the August 7 discovery to file the initial disqualification motion.  In this appeal, Appellants offer no excuse for their delay other than a misrepresentation of the record.  Moreover, Appellants did not file the motions to disqualify IIB's experts until November 6 and November 7, 2014, a mere three weeks before trial was scheduled to begin, despite Judge Myers' finding that Appellants were aware of the potential conflict regarding Mr. Wichman as early as 2011.  (Dkt. 5-4, ER 520.)  Judge Myers' finding that the timing of the DQ Motions illustrated an attempt to delay and disrupt the trial is well-founded in light of Appellants' failure to seek disqualification until the eve of trial, when they could have done so much sooner even under their version of the facts.

Appellants also claim the Bankruptcy Court itself set the timing for the DQ Motions and found the claims merited a multi-day evidentiary hearing at the time of filing.  (Dkt. 4, 16.)  Such contentions distort the record, as the Bankruptcy Court repeatedly warned Appellants of the potential ramifications of making such serious

ethical allegations against opposing counsel.  During the hearing on the Motion to

Continue, Judge Myers noted the allegations "made against opposing counsel are pretty

significant, the rules of course require that there's a good foundation."  (Dkt. 5, ER 75-

76.)  When Attorney Frantz states he needed to review certain files to make that

determination the Court noted that the sensitive issues being pursued "heighten[ed] the

impact of Rule 9011 and all the other rules" and warned Appellants that they needed to

fully brief the issues within a specific time frame if they were going to seek

disqualification.  (*Id.*, ER 88-89.)  Appellants raised the issue of potential disqualification

in their October 3, 2014 Motion to Continue[4] and the Bankruptcy Court advised them that

such allegations required good foundation and should not be brought lightly.  Appellants

then waited another month before filing the DQ Motions.  This is no way suggests the

Bankruptcy Court set the timing of the motions.

Appellants also claim their disqualification "arguments had enough merit to

warrant the bankruptcy court granting an evidentiary hearing on the matter."  (Dkt. 4, p.

21.)  The record suggests otherwise.  Specifically, Judge Myers stated the showing by

Appellants in their briefing "was less than compelling or even preponderating and [was]

not . . . adequate to justify granting the motions[.]"  (Dkt. 5-4, ER 507.)  Judge Myers

nevertheless granted an evidentiary hearing due to the "handicap" he "faced when

requested to resolve serious factual allegations on affidavits" and because "denying the

---

[4] Even the Motion to Continue was filed nearly two months after Mr. Frantz's
purported discovery of HT's prior representation.  Yet Appellants waited another month
to file the initial disqualification motion.

motions on the burden of proof type basis on the then inadequate showing would leave a cloud hanging over the entire case and hanging over [IIB's] law firm[.]"  (*Id*., ER 508.) Because of the serious nature of the allegations Appellants raised, denying the DQ Motions without a hearing could potentially damage HT's reputation even though the allegations were without merit.

As IIB notes, Appellants' contention that the DQ Motions were not reckless and frivolous ignores the reality of the potential ramification of such filings.  (Dkt. 6, p. 45.) The serious ethical violations raised against IIB's attorneys not only threatened to place a "cloud" over the trial if an evidentiary hearing was not conducted, but IIB had also spend hundreds of thousands of dollars in the litigation and underlying Bankruptcy Case, all of which would have been for naught if their attorneys who had been involved in the case since at least 2010 were disqualified less than a month before trial.  (*Id*.)  As Judge Myers concluded:

> The decision to defend the bank's claims by attacking the bank's counsel and doing so with allegations of unethical conduct and conflict was calculated and strategic.  It had the desired effect of vacating and postponing the trial.  It had the additional, and the Court finds the desired effect of putting counsel and IIB to extraordinary expense and at bottom, the allegations lacked merit and were denied in a comprehensive ruling by this Court.

(Dkt. 5-4, ER 490.)

The Ninth Circuit has held bad faith occurs even without a finding of recklessness and frivolousness where a party acts with an improper purpose.  For instance, in *In re Itel Sec. Litig.*, 791 F.2d 672 (9th Cir. 1986), counsel filed objections to exact fee concessions in an action pending before another court.  The objections were not frivolous, nor were

they submitted with any knowledge that they were meritless.  However, because counsel's goal was to gain an advantage in another case, the Ninth Circuit concluded such improper purpose was "alone sufficient to support a finding of bad faith."  *Id*. at 674.  As the Ninth Circuit held in a later case, *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001), "*Itel* teaches that sanctions are justified when a party acts for *an improper purpose*—even if the act consists of making a truthful statement or a non-frivolous argument for objection."  (emphasis in original).  In addition to the improper purpose of increasing expenses and disrupting the litigation, Judge Myers explicitly held the disqualification motions were brought with the intent to manipulate a settlement.  (Dkt. 504, ER 494-95) ("Given their very nature and timing, the disqualification motions before this Court were guaranteed to cause IIB and its counsel to spend significant resources. . . . The manifested intent was to increase the burden of litigation and concomitantly increase the potential of settlement.") In light of such findings, whether the DQ Motions were also reckless and frivolous is beside the point.

Appellants devote much of their brief to the claim that they did not file the DQ Motions with an intent to delay trial.  (Dkt. 4, pp. 14-20.)  Appellants suggest it is "clearly erroneous to infer from the record that the Frantzes and their attorney filed the disqualification motions with the intent to delay trial because none believed that filing the motions would delay the trial in any way."  (*Id*., p. 14.)  Appellants then recount the various reasons why they did not believe the DQ Motions would delay trial, and claim they never wished to delay trial, even when filing the Motion to Continue, but instead sought only an extension of the expert witness disclosure deadline.  (*Id*., pp. 16-17.)

Given Judge Myers' finding that the DQ Motions were filed with an improper purpose, such arguments are misplaced.  Even if Appellants had no desire to delay the trial or any expectation that the DQ Motions would have such effect, the record supports the finding that such motions were filed for an improper purpose.  (Dkt. 5-4, ER 494) ("all this conduct points to the improper use, indeed the misuse of litigation tactics to cause economic injury to an opponent and its counsel in the form of increased litigations costs.").[5]

Significantly, in addition to the improper purpose of increasing expenses and disrupting the litigation, Judge Myers highlighted the malpractice claim Appellants and Attorney Frantz filed after the Bankruptcy Court denied the DQ Motions, and held "the use of the motion to disqualify counsel was a test of [HT] in order to evaluate an anticipated collateral malpractice suit. . . when the malpractice suit was actually brought, the debtors and their counsel disclosed to the state court the existence of the bankruptcy disqualification motion but not its unsuccessful outcome." (*Id.*)  Judge Myers' finding that the DQ Motions were brought for the improper purpose of evaluating a potential malpractice suit against HT is supported by the record, and, in fact, confirmed by Mr.

---

[5] Appellants suggest "inferring that the Frantzes sought to increase litigation costs, too, is against the express evidence.  The Frantzes, debtors in bankruptcy, were struggling financially to defend themselves. . . .  IIB is a bank with assets in the hundreds of millions of dollars.  It is completely backwards for the Frantzes to gain any advantage by increasing litigation costs."  (Dkt. 4, pp. 30-31.)  Under Appellants' theory, a party with less financial resources than their opponent could never be found to have needlessly increased litigation costs, regardless of how many meritless, harassing or vexatious filings they make.  Further, despite a party's economic resources, the cost of litigation is always a factor parties consider when deciding whether to litigate or settle.

Frantz in his June e-mail to IIB.  Mr. Frantz's explicit admission that the initial

disqualification motion was filed in order to vet a malpractice suit against HT in the

hopes of manipulating a settlement with IIB is alone sufficient to support the Bankruptcy

Court's finding of bad faith.  *In re Itel Securities Litigation*, 791 F.2d at 675.  The Court

finds Judge Myers' holding that the DQ Motions were brought in bad faith for an

improper purpose has ample support in the record and was not an abuse of discretion.

   *2.   Sanctions against Attorney Frantz*

   As Appellants note, "sanctions imposed against an attorney should be based solely

on his 'own improper conduct without considering the conduct of the parties or any other

attorney.'" (Dkt. 4, p. 23) (quoting *Primus Auto. Fin. Servs*., 115 F.3d at 650.)

Appellants argue that the Bankruptcy Court improperly attributed Mr. Frantz's action to

Attorney Frantz, and suggest the Court "erred by finding that Attorney Frantz pursued the

disqualification hearing for the purpose of evaluating the merits of a 'future malpractice

case' because Attorney Frantz was unaware that the disqualification hearing would be

used for that purpose."  (Dkt. 4, p. 24.)  Appellants contend, "[t]he bankruptcy court

relied heavily on the [June e-mail] as evidence that the Frantzes and Attorney Frantz

pursued the disqualification hearing for an improper purpose. . . . . However, Attorney

Frantz was not only unaware of the e-mail, but unaware of the alleged ulterior motive."

(Dkt. 4, p. 24.)  The record contradicts this contention.

   Attorney Frantz filed the malpractice suit soon after the DQ Motions were denied.

Attorney Frantz's claim that he had no knowledge of the intended malpractice case at the

time he filed the DQ Motions is questionable in light of his subsequent filing.  In

addition, Attorney Frantz stated during the hearing on IIB's Motion for Sanctions that he and Mr. Frantz consulted a nationally recognized malpractice attorney *before* the DQ Motions were filed, and that the malpractice attorney "felt it was a good case."  (Dkt. 5-3, ER 399.)  This admission undercuts Attorney Frantz's claim on appeal that he was unaware of Mr. Frantz's ulterior motive of evaluating a potential malpractice lawsuit through the DQ Motions.  Moreover, Attorney Frantz addressed the June e-mail during the sanctions hearing, and at no point claimed he was not aware of the facts set forth in the June e-mail or that the DQ Motions were not utilized for the purposes set forth in that e-mail, as he argues here.  In fact, rather than contending he did not know about the June e-mail or the potential malpractice suit during the sanctions hearing, Attorney Frantz instead cited the June e-mail as evidence that the malpractice suit was credible, claiming: "[y]ou know, you can see from [the June e-mail] that Mr. Katz thinks it's a great case, he's willing to take it on contingency.  I think that speaks volumes for what his opinion is about the case.  And it spoke volumes to me as well, as, you know, as we're talking to him."  (*Id*.)  Attorney Frantz's belated claim that he had no knowledge of the June e-mail or the intended malpractice suit lacks evidentiary support and is untenable in light of such testimony.

Finally, even if Attorney Frantz did not know about the June e-mail or Mr. Frantz's admitted tactic of using the DQ Motions as a probe for a future malpractice suit, there is evidence in the record to support Judge Myers' sanctions award against Attorney Frantz.  Attorney Frantz filed the DQ Motions on the eve of trial, nearly three months after Mr. Frantz allegedly discovered he had previously hired HT.  Attorney Frantz also

repeatedly argued a hearing would prove the serious allegations of unethical conduct against HT, and represented Appellants during the subsequent evidentiary hearing.  After two days of testimony and seven witnesses, the Bankruptcy Court determined there was absolutely no basis to disqualify either HT or Mr. Wichman.  In his order denying the DQ Motions, before either the malpractice suit was filed or the June e-mail was sent, Judge Myers also expressly held the arguments advanced by "debtors *and their counsel* could well be viewed as strategic rather than meritorious and spoke to strategic desires rather than principled ones."  (Dkt. 5-4, ER 494; Dkt. 5-4, ER 506) (emphasis added).  Thus, the Bankruptcy Court's finding that Attorney Frantz acted in bad faith is supported by the record regardless of whether he was also involved in the June e-mail.

### 3. *Burden of Proof*

Appellants also suggest the Bankruptcy Court abused its discretion because it failed to recognize the appropriate burden of proof.  Although the burden of proof for finding bad faith remains unsettled in the Ninth Circuit, other circuits have adopted the requirement that bad faith must be proven by clear and convincing evidence.  *Compare Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) *with In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014).  Clear and convincing evidence has been defined as "between a preponderance of the evidence and proof beyond a reasonable doubt."  *Singh v. Holder*, 649 F.3d 1161, 1165 n. 7 (9th Cir. 2011).

Regardless of the appropriate burden of proof, the Court finds the Bankruptcy Court's bad faith finding is supported by clear and convincing evidence.  The Bankruptcy Court awarded sanctions only after making an express finding of bad faith *and* willful

24

misconduct, when either finding would support sanctions.  *In re Dyer*, 322 F.3d at 1196.

In awarding sanctions, the Bankruptcy Court held:

> [U]sing the language of the case law, the conduct of the debtors and their counsel was for an improper purpose and for oppressive reasons and its use and consequence was delaying or disrupting litigation.  As that case law notes, willful actions and even reckless conduct, when combined with improper purpose or harassment, will adequately support the required finding of bad faith and willful misconduct.  This Court, therefore, on the entirety of the record and with emphasis on the facts set forth today, as well as in its prior decisions, finds that the motions to disqualify IIB's counsel and witnesses were made in bad faith, for improper purpose and manifest willful misconduct.

(Dkt. 5-4, ER 494-495.)

Further, as detailed above, there is substantial evidence in the record to suggest the DQ Motions were strategically filed in order to increase expenses, disrupt the litigation, and manipulate a favorable settlement.  In light of such patent improper purpose, the Bankruptcy Court did not abuse its discretion in concluding the DQ Motions were filed in bad faith.

### 4.  Due Process

Before a court may sanction an attorney or party, procedural due process requires notice and an opportunity to be heard.  *Cole v. U.S. Dist. Court for Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir. 2004); *Lasar v. Ford Motor Co*., 399 F.3d 1101, 1110 (9th Cir. 2005) ("[I]t is axiomatic that procedural due process requires notice of the grounds for, and possible types of, sanctions."). The "minimal procedural requirements" of notice and an opportunity to be heard "give an attorney an opportunity to argue that his actions were an acceptable means of representing his client, to present mitigating circumstances, or to apologize to the court for his conduct."  *Lasar*, 399 F.3d at 1110.

Appellants argue the sanctions award deprived them of due process because it was largely based on the malpractice suit even though the malpractice suit "was not raised by IIB in its motion for sanctions, nor was it raised in oral argument, nor was it discussed by the Frantzes in their objection to the motion for sanctions." (Dkt. 4, p. 27.) Once again, the record belies Appellants' contentions.

In its Motion for Sanctions, IIB first notified the Bankruptcy Court about the malpractice suit Appellants had recently filed against HT, stating, "[d]espite the lack of merit and a clear determination by this Court after a two day trial on the issues that no attorney client relationship existed between the Defendants and [HT], the Defendant, Martin Frantz, through his attorney Jonathon Frantz, has filed a lawsuit in state court against [HT] for malpractice on the very same alleged facts and claims." (Dkt. 5-3, ER 314, n. 2.) Appellants' contention that the malpractice suit was not raised by IIB in its Motion for Sanctions, and that it did not have notice of such allegations, is thus false. In addition, Appellants filed an objection to the Motion for Sanctions and could have addressed the malpractice suit therein since IIB had raised the issue, but chose not to do so. (*Id.*, Dkt. 124.) Appellants were given the opportunity to respond but apparently elected not to take it.

Before the sanctions hearing, IIB also filed a Supplement to the Motion for Sanctions. (Dkt. 7-6, EER 516-17.) The Supplement stated:

> On June 5, 2015, IIB forwarded an email correspondence from Mr. Frantz, wherein Mr. Frantz states that he 'pursued the disqualification case as a probe,' so that Mr. Katz could determine how [HT] would defend itself and determine whether he wanted to file a malpractice case against [HT] on a contingency basis. . . . . This email correspondence is further evidence of the bad faith filing in IIB's

26

Adversary Proceeding, as apparently they were pursuing for reasons other than they represented in the disqualification motion.

(*Id*., EER 517.)

In addition to filing the Supplement prior to the sanctions hearing, IIB also gave Appellants and Attorney Frantz notice of their position that the June e-mail warranted sanctions during the hearing by arguing the June e-mail illustrated the DQ Motions were brought for an improper purpose.  (Dkt. 5-3, ER 387-388.)  Attorney Frantz addressed the June e-mail during the sanctions hearing, explained the e-mail illustrated Attorney Katz thought Appellants had a great malpractice case against HT, and contended Attorney Katz's opinion spoke "volumes" about the merits of the malpractice suit.  (*Id*., ER 399-400.)

Contrary to Appellants' contention on appeal, both the malpractice suit and the June e-mail were raised in oral argument.  Appellants had notice of IIB's claim that the malpractice suit and June e-mail constituted bad faith, and was given an opportunity to respond to this claim in both briefing before, and oral argument during, the sanctions hearing.  The Bankruptcy Court did not deprive Appellants or Attorney Frantz of due process by considering the malpractice case and June e-mail when awarding sanctions. Further, the Bankruptcy Court's sanctions order makes clear that the malpractice litigation was merely further evidence of bad faith and willful misconduct.  (Dkt. 5-3, ER 494.)  Even without consideration of the malpractice suit or the June e-mail, the Court finds the Bankruptcy Court's bad faith finding was supported by the record and was not an abuse of discretion.

*5.  Motions to Disqualify Experts*

Finally, Appellants claim the Bankruptcy Court erred by "mistakenly lumping the Motions to disqualify IIB's experts . . . along with the motion to disqualify IIB's counsel in its grant of sanctions."  (Dkt. 4, ER 32.)  Appellants claim "none of the analysis the bankruptcy court performed encompassed the motions to exclude the testimony by IIB's experts."  (*Id.*)  Appellants do not identify the amount of "costs" allegedly improperly included in the sanctions award.  Regardless, the sanctions award was entered to punish Appellants for filing the DQ Motions and to award IIB their costs associated with defending such motions.  The DQ Motions involved not just Appellants' attempt to disqualify IIB's counsel, but also their attempt to disqualify IIB's expert witnesses shortly before trial.  A great deal of the hearing on the DQ Motions was devoted to the latter issue, as was much of the briefing.  Further, a large part of Judge Myers' analysis in the Order Denying Disqualification was focused on explaining why Appellants' attempt to disqualify Mr. Wichman was not only meritless, but also inexcusably delayed.  (Dkt. 5-4, ER 514-521.)  As such, the sanctions award properly included the costs IIB incurred in defending against Appellants' attempt to disqualify their experts.

28

**ORDER**

For the foregoing reasons, the Bankruptcy Court's September 14, 2015 sanctions award against Appellants and Attorney Frantz is **AFFIRMED** in its entirety.

DATED: August 31, 2016

Edward J. Lodge
United States District Judge